PAMELA C. GRANGER, Petitioner-Appellant v. UNIVERSITY OF NORTH CAROLINA AT CHAPEL HILL, Respondent-Appellee

No. COA08-992

(Filed 7 July 2009)

## 1. Administrative Law— standard of review—de novo

The appropriate standard of review is *de novo* where a final agency decision rejects the decision of the administrative law judge.

## 2. Public Officers and Employees— termination of career state employee—unacceptable personal conduct

The trial court did not err by affirming the final decision of the State Personnel Commission to dismiss petitioner career state employee on the basis of unacceptable personal conduct because: (1) petitioner admitted to using the "n" word in the workplace in reference to an African-American employee under the direct supervision of petitioner; (2) by uttering this epithet in the workplace, where petitioner was overheard by one of her subordinates, petitioner undermined her authority and exposed respondent university to embarrassment and potential legal liability; (3) petitioner attempted to obstruct the investigation, which amounted to insubordination, petitioner stated she would not hire another black person, petitioner disposed of the African-American employee's Black History notebook, and petitioner created a general sense of intimidation in the workplace; and (4) petitioner's actions, when considered together, supported her dismissal under all four of the definitions of unacceptable personal conduct under 25 N.C.A.C. 1J.0614(i) including conduct for which no reasonable person should expect to receive prior warning, the willful violation of known or written work rules, conduct unbecoming a state employee that is detrimental to state service, or the abuse of a person over whom the employee has charge or to whom the employee has a responsibility.

GRANGER v. UNIVERSITY OF N.C.

[197 N.C. App. 699 (2009)]

Appeal by Petitioner from order entered 21 April 2008 by Judge R. Allen Baddour, Jr. in Superior Court, Wake County. Heard in the Court of Appeals 10 March 2009.

*Law Offices of Michael C. Byrne, PC, by Michael C. Byrne, for Petitioner-Appellant.*

*Attorney General Roy Cooper, by Assistant Attorney General Kimberly D. Potter, for Respondent-Appellee.*

McGEE, Judge.

Respondent dismissed Petitioner, a career employee, on 19 August 2005, on the basis of Petitioner's unacceptable personal conduct. Isabelle Jones-Parker (Jones-Parker), an African-American and also an employee of Respondent, who was under the direct supervision of Petitioner, sent Respondent a letter in June 2005 arguing, *inter alia*, that Petitioner had subjected Jones-Parker to "racism, harassment and workplace hostility." In response to Jones-Parker's letter, Respondent appointed three investigators to investigate Petitioner's allegations: Karen Silverberg, Assistant Dean for Human Resources for the UNC School of Medicine; Gena Carter, UNC Chapel Hill Human Resources Team Leader; and Joanna Carey Smith, a member of the UNC Chapel Hill Office of General Counsel (the investigators). In the course of their investigation, the investigators obtained statements from other employees under Petitioner's direct supervision. One of those employees, Susan Huey (Huey) stated that she had overheard Petitioner refer to Jones-Parker as "that n———" as Petitioner was leaving Petitioner's office. Petitioner, upon being informed of Huey's statement, admitted she had used the epithet in reference to Parker-Jones, explaining that she knew it was inappropriate. Petitioner stated it had been an expression of her anger due to the investigation, and that she had only used the epithet once, while speaking to her sister on the phone, and had not meant for anyone in the office to overhear it. Another employee, Betty Satterfield (Satterfield), stated that Petitioner had told her Petitioner would never hire another·black person. Satterfield also reported she witnessed Petitioner taking a workbook belonging to Jones-Parker that contained work on Black History month that Jones-Parker was compiling for her church. Satterfield further stated that Petitioner informed her that Petitioner had instructed Petitioner's boyfriend to dispose of the notebook. In addition, Satterfield stated that Petitioner continually spoke with her concerning the ongoing investigation, attempting to elicit information, and instructing Satterfield how to

respond to questioning. Both Huey and Satterfield stated Petitioner created a hostile work environment by continually referring to Petitioner's contacts with Respondent, and Petitioner's ability to use those contacts to punish employees who crossed Petitioner. Petitioner admitted to using the racial slur against Jones-Parker, but denied the other allegations.

The end result of the investigation was the dismissal of Petitioner. Petitioner completed Respondent's internal grievance process without success, and filed a petition for a contested case with the Office of Administrative Hearings on 5 January 2006. Administrative Law Judge (ALJ) Beecher Gray heard the case on 20-21 September 2006, and on 22 December 2006, the ALJ filed his decision in which he concluded Petitioner was improperly dismissed. Respondent appealed to the State Personnel Commission. The State Personnel Commission overturned the ALJ's decision by final decision entered 2 April 2007. Petitioner filed for judicial review, and the matter was heard by the trial court in Wake County Superior Court on 6 December 2007. By order entered 21 April 2008, the trial court affirmed the final decision of the State Personnel Commission. Petitioner appeals.

In Petitioner's arguments, she contends the trial court erred in concluding (1) that one use of a racial slur under these circumstances constituted unacceptable personal conduct, and thus provided just cause for dismissal; (2) that Petitioner's discussions with other employees about the investigation amounted to interference with that investigation, and thus insubordination; and (3) that Petitioner's statement that she would not hire another black person, Petitioner's discarding of Jones-Parker's Black History notebook, and Petitioner's creation of a "general sense of intimidation in the workplace" constituted unacceptable personal conduct, and thus just cause for dismissal. We disagree.

> We observe that . . . subsection 150B-51(c) requires a reviewing court to engage in independent "*de novo*" fact-finding in all contested cases . . . where the agency fails to adopt the ALJ's initial decision. Subsection 150B-51(c) provides, in pertinent part: "In reviewing a final decision in a contested case in which an administrative law judge made a decision, in accordance with G.S. 150B-34(a), and the agency does not adopt the administrative law judge's decision, the [trial] court *shall review the official record, de novo, and shall make findings of fact* and conclusions of law. In reviewing the case, the [trial] court shall not give deference to any prior decision made in the case and shall not be

bound by the findings of fact or the conclusions of law contained in the agency's final decision." N.C.G.S. § 150B-51(c) (2003) (emphasis added).

*N.C. Dep't of Env't & Natural Res. v. Carroll*, 358 N.C. 649, 662-63, 599 S.E.2d 888, 897 (2004) (internal citations omitted).

The [trial] court shall determine whether the petitioner is entitled to the relief sought in the petition, based upon its review of the official record. The [trial] court reviewing a final decision under this subsection may adopt the administrative law judge's decision; may adopt, reverse, or modify the agency's decision; may remand the case to the agency for further explanations under G.S. 150B-36(b1), 150B-36(b2), or 150B-36(b3), or reverse or modify the final decision for the agency's failure to provide the explanations; and may take any other action allowed by law.

N.C. Gen. Stat. § 150B-51(c) (2008).

"When this Court reviews appeals from superior court either affirming or reversing the decision of an administrative agency, our scope of review is twofold . . .: (1) whether the superior court applied the appropriate standard of review and, if so, (2) whether the superior court properly applied this standard."

*Corbett v. N.C. Div. of Motor Vehicles*, 190 N.C. App. 113, 118, 660 S.E.2d 233, 237 (2008). "In cases reviewed under G.S. 150B-51(c), the [trial] court's findings of fact shall be upheld if supported by substantial evidence." N.C. Gen. Stat. § 150B-52 (2008). " 'Substantial evidence is such "relevant evidence as a reasonable mind might accept as adequate to support a conclusion," ' even if contradictory evidence may exist." *Cape Med. Transp., Inc. v. N.C. Dep't of Health & Human Servs.*, 162 N.C. App. 14, 22, 590 S.E.2d 8, 14 (2004) (internal citations omitted); *see also Rainey v. N.C. Dep't of Pub. Instruction*, 181 N.C. App. 666, 671, 640 S.E.2d 790, 794 (2007), *rev. on other grounds by Rainey v. N.C. Dep't of Pub. Instruction*, 361 N.C. 679, 652 S.E.2d 251 (2007); *Enoch v. Alamance County Dep't of Soc. Servs.*, 164 N.C. App. 233, 250, 595 S.E.2d 744, 757 (2004).

[1] Because the case before us involves a situation where the final agency decision rejected the decision of the ALJ, the appropriate standard of review for the trial court was *de novo. Carroll*, 358 N.C. at·662-63, 599 S.E.2d at 897. The trial court stated the correct standard of review in its order. [R.p. 181] We must now decide whether the trial court properly applied that standard of review. *Corbett*, 190 N.C. App. at 118, 660 S.E.2d at 237.

**[2]** At the time of her dismissal, Petitioner was a career state employee as defined by Chapter 126 of the North Carolina General Statutes: the "State Personnel Act."

(a) Any employee, regardless of occupation, position or profession may be warned, demoted, suspended or dismissed by the appointing authority. Such actions may be taken against career employees as defined by the State Personnel Act, only for just cause. The provisions of this section apply only to employees who have attained career status. The degree and type of action taken shall be based upon the sound and considered judgment of the appointing authority in accordance with the provisions of this Rule. When just cause exists the only disciplinary actions provided for under this Section are:

(1) Written warning;

(2) Disciplinary suspension without pay;

(3) Demotion; and

(4) Dismissal.

(b) There are two bases for the discipline or dismissal of employees under the statutory standard for "just cause" as set out in G.S. 126-35. These two bases are:

(1) Discipline or dismissal imposed on the basis of unsatisfactory job performance, including grossly inefficient job performance.

(2) *Discipline or dismissal imposed on the basis of unacceptable personal conduct.*

(c) Either unsatisfactory or grossly inefficient job performance or *unacceptable personal conduct as defined in 25 NCAC 1J. 0614 of this Section constitute just cause for discipline or dismissal.* The categories are not mutually exclusive, as certain actions by employees may fall into both categories, depending upon the facts of each case. No disciplinary action shall be invalid solely because the disciplinary action is labeled incorrectly.

(d) *The imposition of any disciplinary action shall comply with the procedural requirements of this Section.*

25 N.C.A.C. 1J.0604 (2008) (emphasis added). Petitioner was dismissed based upon a finding of unacceptable personal conduct,

which is defined in relevant part as: "conduct for which no reasonable person should expect to receive prior warning"; "the willful violation of known or written work rules"; "conduct unbecoming a state employee that is detrimental to state service"; or "the abuse of . . . person(s) over whom the employee has charge or to whom the employee has a responsibility[.]" 25 N.C.A.C. 1J.0614(i) (2008).

The trial court made the following relevant findings of fact: (1) Based on the investigation of Jones-Parker's complaints, "other employees in the department expressed concerns and difficulties in dealing personally and professionally with Petitioner[.]" (2) Satterfield's testimony was "credible and is consistent with other believable evidence in this case," as was the testimony of Huey. (3) "Petitioner used a racial slur, ——— (hereinafter, the "n" word), in the workplace." Petitioner admitted using this slur on one occasion. (4) Huey, a State employee under Petitioner's direct supervision, overheard Petitioner use the "n" word. (5) Petitioner told Satterfield that Petitioner would "not hire another black person[.]" Satterfield's testimony is bolstered by Petitioner's continued attempts to question and direct Satterfield during the investigation, indicating concern on Petitioner's part with respect to what the content of Satterfield's testimony would be. (6) "Petitioner discarded a Black History project notebook, which was a personal item belonging to Jones-Parker." (7) Petitioner violated the investigators' instructions to avoid speaking to anyone concerning the ongoing investigation, and this violation constituted an act of insubordination. (8) "Petitioner created a general sense of intimidation in the workplace." (9) "Respondent has adopted and administers policies related to racial harassment, discrimination, unlawful workplace harassment, and violence in the workplace." (10) "Respondent has a duty and responsibility to act in compliance with all state and federal laws, including workplace discrimination or harassment laws." And, (11) Respondent acted appropriately in considering the acts of Petitioner

in light of its interest in fostering a fair workplace free of intimidation based on race, ethnicity, or any other relevant factor, as well as in light of the perception of the public (the "public" being other employees in the department or university, or the people of the State of North Carolina), and its interpretation of possible legal actions based on any action of inaction on its own part.

The trial court then made the following relevant conclusions of law: (1) Petitioner's admitted use of the "n" word in reference to

GRANGER v. UNIVERSITY OF N.C.

[197 N.C. App. 699 (2009)]

Jones-Parker "constitutes unacceptable personal conduct, for which no prior warning is required." (2) "Petitioner's discussions with other employees about their interviews with the investigation group amounted to interference with that investigation and such conduct amounts to insubordination." (3) "Petitioner's statement that she would not hire another black person, discarding of Jones-Parker's personal Black History notebook, and creation of a general sense of intimidation in the workplace, when taken together, constitute unacceptable personal conduct, for which no prior warning is required." (4) "The conclusions of law . . . above are individually, and therefore collectively, sufficient to constitute unacceptable personal conduct, and as such, permit Petitioner's dismissal without any prior disciplinary action." And, (5) "Respondent has satisfied its burden of establishing just cause for Petitioner's dismissal."

Though contradictory evidence exists for some of the trial court's findings of fact, we hold that substantial evidence—evidence a reasonable mind might accept as adequate to support a conclusion—exists to support the relevant findings of fact listed above. *Cape Med. Transp., Inc.*, 162 N.C. App. at 22, 590 S.E.2d at 14.

Petitioner admitted using the "n" word in the workplace in reference to Jones-Parker, which remark was overheard by Huey, one of the employees Petitioner supervised. Petitioner initially omitted her use of this racial slur in her interview with the investigators, then changed her statement twice after she was informed another employee had heard her use the racial slur.

Huey made the following written statements: (1) That after a disagreement with Jones-Parker, Petitioner "came out of her office and said under her breath 'that ——' "; and that one "could tell [Petitioner] didn't care for black people, just by the way she treated them or others that came into the office." (2) Petitioner

> told us on many occasions that she knew people on this campus and she could make our lives a living hell if we ever challenged her. She has always thrown around her power at the University[.] I was afraid to apply for another job . . . I didn't want it to get back to her.

(3) Petitioner "was very rude and snippy to everyone, she didn't like to be bothered with questions and that was known." And, (4) "[f]or the past year or so the ethics in the office have [g]one downhill."

Petitioner denied knowing anything about the disappearance of Jones-Parker's Black History notebook, but Satterfield stated that she

saw Petitioner remove the notebook from the cubicle where Jones-Parker had left it, and take it into Petitioner's office. Petitioner later told Satterfield that Petitioner had instructed Petitioner's boyfriend to throw it away. Satterfield also made the following statements: (1) Petitioner instructed Satterfield to deny knowing anything about the notebook when Satterfield spoke with investigators; (2) Petitioner repeatedly questioned Satterfield about the ongoing investigation and instructed Satterfield to withhold information potentially damaging to Petitioner; (3) Petitioner told Satterfield Petitioner would "never hire another black person in her office"; (4) Petitioner told Satterfield that if Jones-Parker "thought it was hostile before [Jones-Parker took a leave of absence], that [Jones-Parker] had no idea how hostile it could be"; (5) Petitioner indicated that she had many contacts in the university, and that she could use those contacts to "make it very difficult for someone to pursue other employment." Petitioner also "bragged that she could get [Jones-Parker] fired. [Petitioner] then told [Satterfield] that [Petitioner] could get in trouble for having told [Satterfield] that information, and that [Satterfield] should not repeat it." And, (6) Petitioner was "furious" that another employee would not divulge the content of her interview with investigators, and Petitioner told Satterfield if Satterfield "found out what was going on that [Satterfield] had better tell [Petitioner]."

Respondent has policies prohibiting racial harassment or harassment in the workplace. Respondent has a duty to enforce these policies, and to further its stated goal of promoting an "environment of tolerance and mutual respect that must prevail if the University is to fulfill its purposes." As stated by the Fourth Circuit in *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 185 (4th Cir. Md. 2001):

> Far more than a "mere offensive utterance," the word "[———]" is pure anathema to African-Americans. "Perhaps no single act can more quickly alter the conditions of employment and create an abusive working environment than the use of an unambiguously racial epithet such as '[———]' by a supervisor in the presence of his subordinates."

*Id.* We agree with the Fourth Circuit's analysis.

By uttering this epithet in the workplace, where Petitioner was overheard by one of her subordinates, Petitioner undermined her authority and exposed Respondent to embarrassment and potential legal liability. Further, Petitioner had attempted to obstruct the investigation, which amounted to insubordination; Petitioner stated

she would not hire another black person, Petitioner took and disposed of Jones-Parker's Black History notebook, and she created a "general sense of intimidation in the workplace." When considered together, we hold the trial court did not err in finding that Petitioner's actions constituted unacceptable personal conduct for which dismissal was proper.

Arguably, Petitioner's actions, when considered together, support her dismissal under all four of the following definitions of unacceptable personal conduct: (1) "conduct for which no reasonable person should expect to receive prior warning"; (2) "the willful violation of known or written work rules"; (3) "conduct unbecoming a state employee that is detrimental to state service"; or (4) "the abuse of . . . a person(s) over whom the employee has charge or to whom the employee has a responsibility[.]" 25 N.C.A.C. 1J.0614(i). We hold Petitioner's unacceptable personal conduct provided Respondent just cause to terminate Petitioner's employment without any prior warning or lesser punishment. 25 N.C.A.C. 1J.0604; *see also Hilliard v. N.C. Dep't of Corr.*, 173 N.C. App. 594, 597, 620 S.E.2d 14, 17 (2005) ("One act of [unacceptable personal conduct] presents 'just cause' for any discipline, up to and including dismissal."). There is substantial evidence supporting the trial court's findings of fact, and we hold that the trial court's findings of fact support its conclusions of law and its 21 April 2008 order. These arguments are without merit.

Affirmed.

Judges GEER and BEASLEY concur.